

**MICHAEL W. DOBBINS**
CLERK

# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### 219 SOUTH DEARBORN STREET
### CHICAGO, ILLINOIS 60604

March 30, 2004

Mr. Tony Anastas, Clerk
U.S. District Court
2300 John Joseph Moakley
United States Courthouse
One Courthouse Way
Room 2010
Boston, MA   02210-3002

Re:    London Fleet Limited, Inc., et al.
      -V-
      London Taxis North America, Inc.,  a/k/a London Taxis of North America, Inc.

USDC No: 04 C 5346 - Judge Shadur

Dear Sr:

Enclosed is the certified record which is being transferred to your court pursuant to an order entered by the
Honorable Milton I. Shadur   on October 21, 2004.  Please acknowledge receipt of the record on the enclosed
copy of this letter.

Sincerely yours,

Michael W. Dobbins, Clerk

By:   Haydee Pawlowski
       Deputy Clerk

Enclosures

New Case No. _____    Date _____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

LONDON FLEET LIMITED, INC., )
LONDON FLEET (ILLINOIS), INC., )
LONDON FLEET (GEORGIA), INC., )
LONDON FLEET (FLORIDA), INC. AND )
LONDON FLEET ADVERTISING AND )
BILLBOARDS, LLC, )
                 )
       Plaintiffs, )
                 )
       v. )        Case No.
                 )
LONDON TAXIS NORTH AMERICA, )
INC. a/k/a LONDON TAXIS OF )
NORTH AMERICA, INC., )
                 )
       Defendant. )

## COMPLAINT

Plaintiffs, London Fleet Limited, Inc., London Fleet (Illinois), Inc., London Fleet (Georgia), Inc., London Fleet (Florida), Inc., and London Fleet Advertising and Billboards, LLC by and through their attorneys Michael A. Stiegel, Helen M. Burke and Raymond M. Krauze (Of counsel, Michael Best & Friedrich, LLP), and for their Complaint against London Taxis North America, Inc. a/k/a London Taxis of North America, Inc. allege as follows:

## PARTIES

1.    London Fleet Limited, Inc. ("LF") now d/b/a London Fleet Limited LLC is a Delaware corporation engaged in the business of selling the world-famous diesel powered United States compliant London Taxi which is manufactured in Coventry, England by London Taxis International Ltd. (said vehicle defined as the "U.S. London Taxi") in conjunction with the other plaintiff. LF's principal of place of business is in Chicago, Illinois.

2.    London Fleet (Illinois), Inc. now d/b/a London Fleet (Illinois), LLC ("London Fleet Illinois") is a Delaware corporation engaged in the business of selling the U.S. London Taxi in Illinois. London Fleet Illinois' principal place of business is in Chicago, Illinois, with a dealership location in Bensenville, Illinois.

3.    London Fleet (Georgia), Inc. now d/b/a London Fleet (Georgia), LLC ("London Fleet Georgia") is a Delaware corporation engaged in the business of selling the U.S. London Taxi in Georgia. London Fleet Georgia's principal place of business is in Chicago, Illinois.

4.    London Fleet (Florida), Inc. now d/b/a London Fleet (Florida), LLC ("London Fleet Florida") is a Delaware corporation engaged in the business of selling the U.S. London Taxi in Florida. London Fleet Florida's principal place of business is in Chicago, Illinois.

5.    LF, London Fleet Illinois, London Fleet Georgia and London Fleet Florida are collectively referred to as London Fleet ("London Fleet", with a web site at www.london-fleet.com).

6.    London Fleet Advertising and Billboards, LLC ("LFA&B") is a Delaware limited liability company engaged in the business of wrap advertising on the exterior of U.S. London Taxis which operate as taxicabs in various cities in the United States. LFA&B's principal place of business is in Chicago, Illinois.

7.    London Taxis North America, Inc. a/k/a London Taxis of North America, Inc. ("LTNA") is a Massachusetts corporation, presently not in good standing in the State of Massachusetts, engaged in the business of completing the final stage manufacturing of the U.S.

2

London Taxi in North America, and LTNA sells and distributes the U.S. London Taxi throughout North America. LTNA's principal place of business is Sudbury, Massachusetts. LTNA has no registered agent with the State of Massachusetts.

8.      London Taxis International, Ltd. ("LTI") is a corporation organized under the laws of England engaged in the business of manufacturing the world-famous diesel engine London Taxi (right hand drive operation for the European market) and the U.S. London Taxi (left hand drive operation).

## JURISDICTION AND VENUE

9.      Federal jurisdiction over this matter is founded in 28 U.S.C. §1332, as the amount in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different states.

10.     Venue is proper in this Court pursuant to 28 U.S.C. §1391, as a substantial part of the events or omissions giving rise to the claims alleged occurred in this District.

## FACTS COMMON TO ALL COUNTS

11.     The world-famous U.S. London Taxi is a purpose-built diesel powered taxicab which is manufactured in Coventry, England by LTI. The unique features of the diesel engine U.S. London Taxi include the longevity of the legendary diesel engine with a useful life lasting more than 500,000 miles, better fuel efficiency, less costly maintenance, left hand drive operation, features for people with disabilities, and the classic and unique London Taxi body style (the "U.S. London Taxi"). LTI manufactures the U.S. London Taxi on a made-to-order

3

basis. In general, it takes approximately twelve (12) to sixteen (16) weeks for a customer of LTNA to receive vehicle delivery from the day LTNA places an order for a U.S. London Taxi with LTI.

13.    Prior to June 6, 2001, LTI owned the worldwide rights to the design, manufacture and sale of the U.S. London Taxi.

13.    On or about June 6, 2001, LTI entered into an agreement with LTNA whereby LTNA acquired the rights to import the U.S. London Taxi into North America, to finish the U.S. London Taxi as final stage manufacturer of the vehicle in North America and to distribute the U.S. London Taxi in North America.

14.    Before December 6, 2002, on various occasions, LTNA and Larry Smith, who is President, CEO, the largest shareholder and founder of LTNA, and LTNA discussed a potential investment in LTNA with Patton Corrigan, a representative of Metro Transit Management, Inc. and Yellow Investments, Inc., (both defined as the "Investors"), as representative of the Investors, a potential investment in LTNA.

15.    During these various meetings and conversations, LTNA and Larry Smith, in order to induce the Investors to invest, represented that any investment would support the marketing of the U.S. London Taxi. Specifically, Mr. Smith represented to Patton Corrigan that the U.S. London Taxi has a significantly greater lifespan than a gasoline engine taxicab and that the diesel engine taxicab has greater efficiency than a gasoline engine taxicab, and that the more costly U.S. London Taxi (approximately two to three times more expensive than a U. S.

manufactured taxicab, e.g., the Ford Crown Victoria) could be justified by the longevity and reduced maintenance costs.

16.    Mr. Smith and LTNA did not disclose to the Investors that LTNA would have to substitute or substantially reengineer the U.S. London Taxi within a year or two of any investment.

17.    In reliance on Mr. Smith's representations, the Investors invested $600,000 in LTNA and received shares and certain distributorship rights in return.

18.    At or around the time of the investment, LF was formed to hold the distribution rights of the U.S. London Taxi for Illinois. Later, London Fleet Illinois, London Fleet Florida and London Fleet Georgia were formed to market, sell and distribute the U.S. London Taxis in their territories.

19.    On or about December 6, 2002, LTNA entered into an agreement with LF whereby LF acquired the exclusive right to market, sell and service the U.S. London Taxi in the State of Illinois. Pursuant to the agreement, LTNA agreed to supply a certain number of U.S. London Taxis each year to LF and LF agreed to sell a certain number of U.S. London Taxis each year in Illinois.

20.    Based on testing of the U.S. London Taxi, on or about May 12, 2003, LTNA received a Certificate of Conformity from the U.S. Environmental Protection Agency that enabled LTNA to sell in all 50 states the U.S. London Taxi. The Certificate of Conformity states, in pertinent part:

5

"This certificate covers only those new motor vehicles or vehicle engines which conform, in all material respects, to the design specifications that applied to those vehicles or engines described in the documentation required by 40 C.F.R. part 86 and which are produced during the 2003 model year production period stated on this certificate of the said manufacturer as defined in 40 C.F.R. part 86."

21.    Based on testing of the U.S. London Taxi, on or about May 15, 2003, LTNA received an Executive Order from the California Environmental Protection Agency Air Resources Board ("CARB") which resolved that, for the 2003 model production year U.S. London Taxi's, "exhaust and evaporative emission control systems produced by the manufacturer are certified ...."

22.    According to LTNA's 2003 Monroney Label, LTNA's Manufacturer's Suggested Retail Price ("MSRP") for the 2003 U.S. London Taxi ("Civilized Taxi" version a/k/a vinyl seats) was $48,800.00 USD.

23.    According to LTNA's 2003 Monroney Label, the U.S. London Taxi had a fuel efficiency of approximately 24 miles per gallon for city driving and 27 miles per gallon for highway driving.

24.    On or about June 17, 2003, LTNA entered into an Amended Distributor Agreement with London Fleet Illinois whereby London Fleet Illinois acquired the exclusive right to, *inter alia,* market, sell and service the U.S. London Taxi in Illinois. Pursuant to the agreement, London Fleet Illinois agreed to purchase a certain number of U.S. London Taxis each year in Illinois.

25.    The Illinois Agreement with London Fleet Illinois (the "Illinois Agreement") states in pertinent part:

6

"As and when Distributor shall from time to time desire to purchase London Taxis (or spare parts for same) from LTNA pursuant to this Agreement for sale to Qualified Customers, Distributor shall place purchase orders with LTNA covering same, and LTNA agrees to supply Distributor with such London taxis ....." Illinois Agreement, 5a (i).

26.     On or about June 17, 2003, LTNA entered into an agreement with London Fleet Georgia whereby London Fleet Georgia acquired the exclusive right to market, sell and service the U.S. London Taxi in Georgia. Pursuant to the agreement, London Fleet Georgia agreed to sell a certain number of U.S. London Taxis each year in Georgia (the "Georgia Agreement").

27.     The Georgia Agreement states in pertinent part:

"As and when Distributor shall from time to time desire to purchase London Taxis (or spare parts for same) from LTNA pursuant to this Agreement for sale to Qualified Customers, Distributor shall place purchase orders with LTNA covering same, and LTNA agrees to supply Distributor with such London taxis ....." Georgia Agreement, 5a (i).

28.     On or about June 17, 2003, LTNA entered into an agreement with London Fleet Florida whereby London Fleet Florida acquired the exclusive right to market, sell and service the U.S. London Taxis in Florida. Pursuant to the agreement, London Fleet Florida agreed to purchase a certain number of U.S. London Taxis each year in Florida (the "Florida Agreement").

29.     The Florida Agreement states in pertinent part:

"As and when Distributor shall from time to time desire to purchase London Taxis (or spare parts for same) from LTNA pursuant to this Agreement for sale to Qualified Customers, Distributor shall place purchase orders with LTNA covering same, and LTNA agrees to supply Distributor with such London taxis ...." Florida Agreement, 5a(i).

30.     Each of the Distributor Agreements with respect to Illinois, Florida and Georgia provided for a year-to-year increase in sales quotas for the respective London Fleet companies

7

and the Distributor Agreements did not anticipate in any manner a period of time in which LTNA would not have the U.S. London Taxi readily and commercially available for the London Fleet companies to deliver in the U.S.

31.    As part of LTNA's business plan, LTNA represented that the relatively high price of the U.S. London Taxi could be justified based on the legendary long-lasting diesel fuel engine. As recent as December 2003, LTNA's business plan listed the number one vehicle feature "Built to last longer than any other taxi in the world - London taxis typically log 500,000 - 700,000 miles".

32.    In LTNA's December 2003 business plan, LTNA projected sales as follows:

Year 1 (Aug '03-July '04) sales will exceed $28,000,000 (600 vehicles)

Year 2 (Aug '04-july '05) sales will exceed $54,000,000 (1,200 vehicles)

Year 3 (Aug '05-July '06) sales will exceed $79,000,000 (1,800 vehicles)

Year 4 (Aug '06-July '07) sales will exceed $107,000,000 (2,400 vehicles)

Year 5 (Aug '07-July '08) sales will exceed $134,000,000 (3,200 vehicles)

33.    Actual LTNA sales of the U.S. London Taxi between August 2003 and July 2004 are approximately 180.

34.    Out of approximately the 180, the London Fleet companies are by far LTNA's largest customer with approximately 41 U.S. London Taxi sales during 2003 and 2004.

35.    After entering into the agreements, Marc Klein and Robert Klein, representatives of London Fleet and LFA&B, received from Larry Smith numerous correspondence in which Mr. Smith promoted the marketability and salability of the U.S. London Taxi based on the

8

longevity of the diesel engine. In addition, Mr. Smith made those representations to city officials and taxicab regulators across the United States.

36.     In reliance on LTNA's and Larry Smith's representations, after acquiring the exclusive rights to market and sell the U.S. London Taxi in Illinois, Georgia and Florida, London Fleet and LFA&B invested well over $2,500,000.00 to promote the sales of the U.S. London Taxi. London Fleet and LFA&B with the approval of and at the request of LTNA, London Fleet representatives, Marc Klein and Robert Klein traveled throughout the United States and met with taxicab owners in numerous metropolitan areas to discuss the benefits of the U.S. London Taxi, and especially its main selling point, the lifespan of the diesel engine.

37.     Prior to February 26, 2004, when LFA&B entered into a written agreement with LTNA wherein LFA&B obtained certain rights to, *inter alia*, sell wrap advertising on the exterior of the U.S. London Taxis in the United States, the parties had an oral agreement giving LFA&B similar rights to those contained in the written agreement.

38.     LFA&B also invested hundreds of thousands of dollars establishing infrastructure and developing marketing materials to sell "wrap advertising" for the U.S. London Taxis sold by London Fleet and LTNA across the United States.

39.     As part and parcel of the business arrangements between the parties, LFA&B facilitated sales of the U. S. London Taxi in the United States and used wrap advertising revenues both actual and projected to promote London Fleet and LTNA sales in an effort to offset a portion of the monthly financing payments.

40.    To promote sales of the London Taxi throughout major cities in North America, LFA&B representatives including Marc Klein and Robert Klein traveled multiple times to meet with (1) taxicab operators, (2) taxicab regulators, and (3) members of the disability community in, for example, San Francisco, Las Vegas, New Orleans, Washington D.C., Dallas, and Nova Scotia. This is in addition to traveling multiple times to meet with the same groups in, for example, LF territory cities of Miami, Jacksonville, Orlando, Atlanta, and in its home city of Chicago as well.

41.    For the seven (7) vehicles purchased by LTNA taxicab operator customers in the San Francisco marketplace, LFA&B committed to a financial guaranty of $600.00 per London Taxi per month to each of the taxicab operators for a period of forty-eight (48) months. These financial guarantees by LFA&B total $28,800.00 per vehicle, bringing the total LFA&B financial liability to $201,600.00 to facilitate sales to LTNA customers in the San Francisco marketplace.

42.    Larry Smith has repeatedly admitted to LFA&B that the San Francisco LTNA sales would never have occurred without LFA&B's financial guarantees.

43.    LFA&B also purchased, on behalf LTNA's customers in San Francisco, all of LTNA's recommended initial parts stocking order for all fifteen (15) program vehicles.

44.    In the Las Vegas marketplace, LFA&B initiated the sales leads and eventually offered a $10,000.00 upfront subsidy to prospective LTNA customers for up to 40 vehicles purchased in the marketplace, a potential total LFA&B upfront cash outlay of $400,000.00. In

accordance with the five (5) sales that occurred to Las Vegas LTNA customer Desert Cab, LFA&B on July 12, 2004 sent a $50,000 check directly to LTNA to effectuate this transaction.

45.    Larry Smith has repeatedly admitted to LFA&B that the Las Vegas LTNA sales would never have occurred without LFA&B's financial guarantees.

46.    LFA&B has spent tens of thousands of dollars to develop the London Fleet Disability Advisory Council (www.LFDAC.com), whose purpose is to educate each local community of the existence of the London Taxi and its accessibility features (irrespective of the territory in which a London Taxi is purchased). The LFDAC's three board members, who are nationally active in the disability community, have also traveled the country to promote sales of the U.S. London Taxi and have met with taxicab regulators and have testified before the San Francisco Taxicab Commission and the New Orleans City Council.

47.    Larry Smith has repeatedly admitted to LFA&B that LTNA will "never" have any success in major U.S. taxicab markets without LFA&B's program because of the U.S. London Taxi's relatively high price.

48.    On August 12, 2004, Jeff Nieves of LTNA admitted in a telephone call to Marc Klein of LFA&B that he does not include LFA&B in any of LTNA's sales strategies, proposals, meetings or prospects in violation of the LFA&B Agreement because he "takes orders from Larry Smith."

49.    LFA&B on numerous occasions has provided LTNA with market research and contact information for LTNA salespeople to pursue prospective opportunities.

11

50.    To date, LFA&B on numerous occasions has provided LTNA with market research and contact information for LTNA salespeople to pursue prospective opportunities.

51.    In or about December 2003, LTNA, for the first time, disclosed to London Fleet and LFA&B that the U.S. London Taxi would not meet the United States EPA emissions standards, that LTNA would not supply the 2005 model production year U.S. London Taxi  and that the 2005 model production year U.S. London Taxi would not be marketable or salable in the United States

52.    In or about December 2003, LTNA, for the first time, in a letter to shareholders disclosed to the Investors, London Fleet and LFA&B that that it was investigating development of a new and different product never before manufactured by LTI or LTNA (*i.e.*, a gasoline powered taxicab with the traditional London Taxi body) for the U.S. marketplace.  London Fleet and LFA&B objected to the substitution of this product for the U.S. London Taxi given their significant investment in the promotion, marketing and sale of the U.S. London Taxi, and specifically its diesel engine.

53.    London Fleet and LFA&B learned, among other things, that the distribution of the gasoline powered taxicab was not economically feasible given the loss of the vehicle's number one selling feature; to wit: the longevity of the diesel engine.

54.    London Fleet and LFA&B repeatedly requested from LTNA and Larry Smith marketing plans, feasibility studies and market research, validating the marketability and salability of a gasoline powered taxicab and received none.

55.    From December 31, 2003 through May 25, 2004, London Fleet and LFA&B did not receive any formal report on LTNA's preparedness to supply a 2005 model production year vehicle from LTNA which could be sold in the United States.

56.    Accordingly, London Fleet and LFA&B became concerned that LTNA would not be able to market or sell London Fleet U.S. London Taxis in 2005 and that LTNA would not be able to perform its contractual obligations.

57.    On numerous occasions, beginning in February 2004, the Investors, through Patton Corrigan, London Fleet and LFA&B representatives, including Marc Klein and Robert Klein, requested that LTNA assure London Fleet that LTNA expected to perform its obligations under the agreements.

58.    On numerous occasions, beginning in February 2004, London Fleet and LFA&B representatives, including Marc Klein and Robert Klein, requested that LTNA assure London Fleet and LFA&B that LTNA intended to pursue a diesel fix (by diesel emissions filter or otherwise) to insure the integrity and longevity of the U.S. London Taxi and to insure that LTNA would sell the diesel powered U.S. London Taxis in January 2005 and beyond.

59.    LTNA failed and continues to fail to provide London Fleet and LFA&B with assurances that it intends to pursue any diesel fix (by diesel emissions filter or otherwise) and supply the U.S. London Taxi for sale in January 2005 and beyond.

60.    LTNA also failed and continues to fail to provide London Fleet and LFA&B with assurances that it has developed a marketable and salable London Taxi with a gasoline engine or a diesel engine to be sold in January 2005 and beyond.

13

61.    Notwithstanding LTNA's decision not to pursue the further development of a compliant diesel engine, LTNA also fails and continues to fail to provide London Fleet and LFA&B with assurances that it will have a marketable and salable London Taxi with a gasoline engine to be sold at anytime during 2005.

62.    LTNA notified London Fleet and LFA&B that it would have such a vehicle (1) by January 1, 2005, (2) by the first quarter of 2005 and (3) by the second quarter of 2005. LTNA does not have a precise date for any time in 2005 that a 2005 model production year vehicle will be deliverable.

63.    From May 2004 through August 2004, LTNA, from time to time, requested London Fleet to stockpile 2004 U.S. London Taxis at London Fleet's risk and expense.

64.    Given LTNA's request to London Fleet to purchase 2004 compliant vehicles and Larry Smith's and LTNA's moving target for production of any marketable and salable 2005 model production year vehicles, London Fleet became more concerned that LTNA would not be able to provide London Fleet U.S. London Taxis in 2005 for its own account and distribution and would not be able to honor its contractual obligations.

65.    On August 3, 2004, Marc Klein of London Fleet and LFA&B again requested that LTNA advise London Fleet of the detailed status of the marketable and salable vehicle for 2005. Mr. Klein requested the status of the diesel fix as well as the status of the gasoline engine. Marc Klein wrote:

"On behalf of the LF distributorships, and as a formal notice from them, please advise ASAP as to the detailed status of the vehicle which will be available to sell in 2005. What is the status of the gasoline engine? What is the status of the diesel

14

fix? What vehicle from LTNA will the LF dealerships be able to sell on Jan. 1, 2005? If LTNA wants to "stockpile" vehicles at the end of 2004, what formal written plan is in place to make that happen? Larry, these questions need to be resolved immediately and we need a formal and detailed response from LTNA."

66.    On August 6, 2004, the Investors, through Patton Corrigan, London Fleet and LFA&B participated in a conference call with Larry Smith, LTNA and their advisors regarding the outstanding issues.

67.    Larry Smith and LTNA refused to assure or guaranty that LTNA would be able to produce a marketable and salable vehicle for 2005.

68.    On August 9, 2004, LTNA and Larry Smith again admitted LTNA would not be able to supply a vehicle until at least April 2005, if then.

69.    The gasoline powered taxicab proposed by LTNA may have to be crash tested pursuant to United States federal regulations which will further delay LTNA's ability to supply such vehicle.

70.    The London Fleet contracts state in pertinent part:

"LTNA shall be solely responsible to certify and warrant compliance, and to correct and remedy any non-compliance, of all said London Taxi vehicles." Par. 1, Illinois, Georgia and Florida Agreements.

71.    LTNA and Larry Smith unilaterally determined, without any discussion or input from London Fleet or LFA&B, that LTNA will not sell or distribute in 2005 and beyond a U.S. London Taxi.

72.    LTNA has failed to use commercially reasonable efforts to make available for sale and distribution to London Fleet a 2005 model production year U.S. London Taxi.

## COUNT I
**(By London Fleet Illinois -Anticipatory Breach of the Illinois Agreement)**

73.    London Fleet Illinois alleges as fully set forth therein the allegations contained in paragraphs 1 through 72 above.

74.    Pursuant to the Illinois Agreement, LTNA agreed to sell the U.S. London Taxi to London Fleet.

75.    From December 2003 through August 2004, LTNA's actions and communications raised serious concerns to London Fleet Illinois that LTNA would not be able to perform its contractual obligations.

76.    Beginning in February 2004, London Fleet Illinois repeatedly requested that LTNA provide assurances that LTNA intended to perform its contractual obligations by supplying a 2005 model production year U.S. London Taxi.

77.    LTNA did not provide London Fleet Illinois with any assurance or guaranty that LTNA expected to perform its contractual obligations.

78.    On and before August 9, 2004, LTNA admitted that it currently has no 2005 model production year U.S. London Taxi which can sold and distributed in the U.S.

79.    London Fleet Illinois has performed all of its contractual obligations.

16

80.     LTNA's conduct constitutes an anticipatory breach of contract and has damaged London Fleet Illinois in that LTNA has precluded London Fleet Illinois from selling the U.S. London Taxi.

## COUNT II
### (By London Fleet Georgia - Anticipatory Breach of the Georgia Agreement)

81.     London Fleet Georgia alleges as fully set forth therein the allegations contained in paragraphs 1 through 80 above.

82.     Pursuant to the Georgia Agreement, LTNA agreed to sell the U.S. London Taxi to London Fleet.

83.     From December 2003 through August 2004, LTNA's actions and communications raised serious concerns to London Fleet Georgia that LTNA would not be able to perform its contractual obligations.

84.     Beginning in February 2004, London Fleet Georgia repeatedly requested that LTNA provide assurances that LTNA intended to perform its contractual obligations by supplying a 2005 model production year U.S. London Taxi.

85.     LTNA did not provide London Fleet Georgia with any assurance that LTNA expected to perform its contractual obligations.

86.     On and before August 9, 2004, LTNA admitted that it currently has no 2005 model production year U.S. London Taxi which can be sold and distributed in the U.S.

87.     London Fleet Georgia has performed all of its contractual obligations.

17

88.    LTNA's conduct constitutes an anticipatory breach of contract and has damaged London Fleet Georgia in that LTNA has precluded London Fleet Georgia from selling the U.S. London Taxi.

## COUNT III
### (By London Fleet Florida -Anticipatory Breach of the Florida Agreement)

89.    London Fleet Florida alleges as fully set forth therein the allegations contained in paragraphs 1 through 88 above.

90.    Pursuant to the Florida Agreement, LTNA agreed to sell the U.S. London Taxi to London Fleet.

91.    From December 2003 through August 2004, LTNA's actions and communications raised serious concerns to London Fleet Florida that LTNA would not be able to perform its contractual obligations.

92.    Beginning in February 2004, London Fleet Florida repeatedly requested that LTNA provide assurances that it intended to perform its contractual obligations by supplying a 2005 model production year U.S. London Taxi.

93.    LTNA did not provide London Fleet Florida with any assurance that LTNA expected to perform its contractual obligations.

94.    On and before August 9, 2004, LTNA admitted that it currently has no 2005 model production year  U.S. London Taxi which can be sold and distributed in the U.S.

18

95.    London Fleet Florida has performed all of its contractual obligations.

96.    LTNA's conduct constitutes an anticipatory breach of contract and has damaged London Fleet Florida in that LTNA has precluded London Fleet Florida from selling the U.S. London Taxi.

## COUNT IV
## (By LFA&B - Breach of Contract)

97.    LFA&B alleges as fully set forth therein the allegations contained in paragraphs 1 through 96 above.

98.    Pursuant to the LFA&B Agreement dated as of February 26, 2004, LTNA agreed, *inter alia,* (1) to exclusively promote and sell LFA&B's advertising programs to LTNA's customers and prospective customers, (2) that LFA&B is the exclusive wrap advertising agency for the London Taxi's in the U.S., and (3) that LTNA will advise LTNA's customers and prospective customers and the public of (1) and (2) above.

99.    LTNA further agreed to jointly work, communicate and cooperate with LFA&B to promote and sell the wrap advertising programs on a nationwide basis.

100.    LTNA has breached the LFA&B agreement since LTNA has failed to jointly work, communicate and cooperate with LFA&B to promote and sell the wrap advertising programs on a nationwide basis.

19

101.    LTNA has breached the LFA&B Agreement by refusing to inventory a U.S. London Taxi in any color other than black, despite repeated requests for different colors such as yellow or white which are major colors for taxicab operators in the United States.

102.    LTNA has breached the LFA&B agreement because LTNA has not included LFA&B in any of LTNA's sales strategies, proposals, meetings or prospects.

103.    LFA&B has performed all of its contractual obligations.

104.    LTNA's conduct constitutes a breach of contract and has damaged LFA&B in that LTNA has precluded LFA&B from selling advertising for the U.S. London Taxi and from promoting the LFA&B's wrap advertising program.

WHEREFORE, Plaintiffs, London Fleet Limited, Inc., London Fleet (Illinois), Inc., London Fleet (Georgia), Inc., London Fleet (Florida), Inc., London Fleet Advertising and Billboard, LLC, Inc. request that this Court enter judgment in their favor and against, Defendant London Taxi North America, Inc. in an amount in excess of $75,000, exclusive of interest and costs, to be determined at trial, plus pre-judgment interest, attorney's fees in favor of LFA&B, the costs of this action and such other and further relief as this Court deems just.

Dated: August 13, 2004

> LONDON FLEET LIMITED, INC.,
> LONDON FLEET (ILLINOIS), INC.,
> LONDON FLEET (GEORGIA), INC.,
> LONDON FLEET (FLORIDA), INC. AND
> LONDON FLEET ADVERTISING AND
> BILLBOARDS, LLC,
>
> _____
> One of Their Attorneys

Michael A. Stiegel (02735830)
Helen M. Burke (6226448)
Raymond M. Krauze (06280400)
MICHAEL BEST & FRIEDRICH LLC
401 North Michigan Avenue, Suite 1900
Chicago, IL 60611
Tel: (312) 222-0800
Fax: (312) 222-0818

S:\firm\000000\0463\C0411446.1

21